I thought you were going to throw something at me. My name is Palmer Huvestal. I'm an attorney from Helena, Montana, and I'm appearing in this matter on behalf of Chang Gu Yu. And the sole issue that I'd like to argue today, members of the Court, is the double jeopardy issue. As the Court well knows, the double jeopardy clause of the Fifth Amendment prevents a, well, after a dis- Counsel, it seemed to me on the double jeopardy that when the judge said, you have anything to say? You want to make a record? When the jury was still there, that was the time to say, Your Honor, we're not the ones asking for a new trial. We want to go on. We want to have this trial. And the jury was still there, and the judge would have said, okay, or else given a good reason, to the contrary. I think that's exactly right, Your Honor. But it was incumbent upon not Mr. Chang Gu Yu to make that objection, but upon the government. Why? Because, to begin with, it was not Chang Gu Yu's motion. Chang Gu Yu did absolutely nothing whatsoever to cause the grounds for the mistrial. Secondly, he did nothing whatsoever to support Mia Yim's motion for a mistrial. It seems to me that sitting on his hands is kind of a sandbagging thing. If things go well, he takes advantage of it, and if things go badly, he says, that wasn't me. Well, no, Your Honor. Mr. Chang Gu Yu did absolutely everything he could to cause the trial to go forward. No, that's unless I'm missing something, and I want you to educate me if I am. He did not do everything he could or even anything to cause it to go forward. What would have been causing it to go forward would have been, Your Honor, I want the trial to go forward. Just say so, while the jury is still there. The Court had already declared a mistrial. There was no opportunity with respect to that. And Ms. Yim and Mr. Chang Gu Yu were separate and distinct defendants. No, but it's not like that. I think one of the cases that was cited, the judge sort of blew up and declared a mistrial and ran off, and no one had a chance to say anything. It wasn't that type of situation. I think there was on more than one occasion. Does anyone want to make a record? Well, everyone sits there and no one wants to say anything else. Why wouldn't that be the time? Well, what – and this is the question that I posed in my brief. Query, why would Chang Gu Yu object to Mia Yim's motion when it was entirely appropriate for the Court to declare a mistrial as to Mia Yim? Mr. Donahoe didn't speak to that. Well, it's called the best of both worlds. Well, I think like Judge Kleinfeld said, you know, maybe I can get a not guilty. If I can't get a not guilty, then I'll claim double jeopardy. But it's incumbent upon the government to make that motion. Mr. Chang Gu Yu did not have a dog in that fight. He didn't make the motion. Well, they're – but they do. They're in the same – they're co-defendants. They're in the same trial. So, you know, how can the government deal with one person that says nothing and which – why can't the government rely on that as they're not objecting and the other person that is objecting and deciding whether that's grounds for a mistrial? Because the proposed alternatives that the district court engaged in, that was to get a tape recorder, allow this witness to testify without the use of a court-certified interpreter, and in the event that there was something – some sort of a problem with respect to the interpretation, then we'd have a record that we could go back and review that on appeal. And that was completely agreeable to Chang Gu Yu and his counsel. I think in addition to objecting to a mistrial, you could have said, I want a severance. He's got a problem with the interpreter. I don't have a problem with the interpreter. We want to go. Yes, again, we could have done that, but, again, it was incumbent upon the government to do so. Well, the government wouldn't ask for a severance. You would. Well, I guess either one could. Well, again, I think it was incumbent upon the government because they're the ones that caused the mistrial. The statute clearly required the government to obtain a court-certified interpreter for the Spanish-speaking witness. They did not do that. The district court recognized that they did not do that and, as a basis of that, granted the Mia Yims motion for mistrial. Again, I think it's critical to this analysis that Mr. Chang Gu Yu did not make the motion. He did not join it. Indeed, if the Court will recall in the record, when Mia Yims' counsel objected to the interpreter not being a court-certified interpreter, Chang Gu Yu expressly joined in that objection. But there was no express joinder in the motion for a mistrial. Indeed, there was no implied joinder in the motion for a mistrial. He said, we'll accept that alternative, and in the event that that didn't occur or couldn't occur, we will allow the government to take whatever time is necessary for it to procure a court-certified interpreter. The government went back, attempted to obtain a court-certified interpreter that it could bring to the trial on short notice, and they couldn't do it. And as a result of that, Mia Yims' counsel objected again and made a motion for a mistrial. Nowhere in that colloquy was it, can it even be implied by the language that Chang Gu Yu joined in that motion. And again, because it was the government's fault, it was incumbent upon the government to move for a severance and to continue on with the proposals that the district court had made with the trial, because that was acceptable to Chang Gu Yu. Now again, there's only two ways in which the Fifth Amendment allows a retrial, or the Fifth, yeah, Fifth Amendment allows a retrial after mistrial has been declared. And that's one, if there's been implied consent, and two, if there's manifest necessity. I don't think that on this record, mere silence can be construed to be implied consent. I think the best that it can be construed to be is an acquiescence that this trial was appropriate as to Mia Yim. So I think that argument that's made by the government is foreclosed. And I think respectfully that the district court erred in making that finding. I'm still missing something on why it wasn't incumbent on you to object. I thought that you, the defendant, had. I thought that what the cases came down to was whether the defendant had a chance to object and didn't do so, because the defendant sometimes will want the mistrial, and sometimes will want the trial to proceed without the delay of a mistrial. I think, Your Honor, it's because, for example, in the Roberts case and the Bates case, those defendants, and this is colloquialism, had a dog in the fight. In this instance, Hengu Yu did not. He was- Well, he has a dog in the fight about whether he gets to keep this jury or gets a different jury, and whether he gets to keep the direct and cross examinations that have been heard by this jury, or whether they go again. Well, I don't know about that, because I think that he was an innocent bystander. Here we have, on one hand, Mia Yim arguing to the court for a mistrial. We have the government objecting to that motion. Hengu Yu is silent with respect to that issue. Again, a mistrial was entirely appropriate with respect to Mia Yim, because all the alternatives have been exhausted for a continuance of the trial. But why shouldn't he have said something like, you know, this is going. I mean, I think this is going very well for you at this point, or, you know, that you as counsel say that. And I don't want to, you know, I don't want to start over with Hengu Yu, or maybe for, you know, Yim, or it's in the toilet, and it's not going well. But, I mean, frequently, co-defendants, one is going really well, and the other is going poorly. I mean- Well, Your Honor, I think that if we take a look at the language of what transpired in the transcript, the district judge said three times, I'm going to declare a mistrial. And that's on page, beginning on page 182 in Exhibit, EPSA for Record Number 9. He says three times, I'm going to declare a mistrial. Then he says, I have declared a mistrial. So I don't think that there are, in other words, I think that when he says, I'm going to declare a mistrial, that's not simply a thought process that the district court had undergone. I think it is. I mean, the lawyers aren't potted plants. Judge says he's going to do something that's wrong. The lawyers jump up and tell him he's wrong. And that's how judges avoid error. Well, Your Honor, I'd point Your Honor out to page 184 of Exhibit, Exhibit for Record 9. 184 of you? Yes. Thanks. Got it. And beginning at line 8, and then from English back to the Chinese, and with Mr. Donahoe. I've got, that's where the home's located. I must have the wrong book here. It's in Exhibit for Record Number 9. Oh. Okay.     This is what it says. And for the record, it's page 184. It's beginning at line 10, or rather, line 9. And with Mr. Donahoe not being in any kind of position to know if there's a problem with the Spanish, even though Mr. Huvasol may, I just, the thing is, it's not going, it's just not going correctly. So, I'm going to declare a mistrial. In the next sentence, he says, and bring in the jury if you would, Barb, and I will tell them that I have declared a mistrial. So, at that juncture, it was understood by everybody that the first time he uttered the words, I'm going to declare a mistrial, he had declared a mistrial. Well, if you had objected, if you really did object to having a mistrial, you certainly could have said something like that. Well, there was no opportunity to object. Well, he said, bring in the jury. That means the jury's not there yet. Well, he says that I have declared a mistrial. So, I mean. No, he says, I'm going to bring in the jury and I'll tell them that I have. That means the jury's not there yet. So, the lawyer can tell the judge, you're making a mistake. When I was a district judge, lawyers helped me prevent mistakes that way. Told him, that's fine for one, but not for us. You know, I mean, say something. Well, I would agree that the district court had declared a mistrial. And if we look at footnote 8 in Bates, Bates says that there's no formalistic requirement to make an objection after the fact. I guess I'm thinking of Smith, United States v. Smith, this decision that Judge Troy wrote, where he says, knowing intelligent and voluntary waiver does not apply in double jeopardy cases, and that you don't need a request or an express consent to the mistrial, silence of counsel may be implied consent. As to Mia Yim, and I've gone two minutes over, I see. Go ahead and respond to why Smith doesn't apply. Again, because silence was appropriate as to Mia Yim, who made the motion for a mistrial. It was not appropriate as to Mr. Changu Yu. Thank you, counsel. Good morning, Your Honors. Tony Gallagher representing Mia Yim, also known as Mia Pigman. We had three issues in our blue brief. The third, we concede, has been decided by the Supreme Court's decision in Iowa v. Tovar. However, we would like to argue this morning the two remaining issues. First, that the district court failed to meaningfully analyze the prosecutor's alleged gender neutral reasons for using all of his peremptory strikes to exclude women from the jury. And secondly, in the jury charge, the district court refused to instruct the jury that the defendant, Yim, must knowingly conceal, harbor, or shield illegal aliens. Your Honors, the third problem. Counsel, on the women thing, I was thinking, you get an artist. You don't know that much about jurors when you're doing voir dire. And you get an artist up there, the prosecutor's going to think, well, artists tend to be on the liberal side, better perempt the artist. It doesn't matter if they're men or women. That's not what she said. That's not the reason that the government gave. And most respectfully, Judge Kleinfeld, what you're doing now is exactly what Judge Malloy did below, and that is find a reason that was given, or find a reason for a strike, not focusing on a discriminating view of what the prosecutor's reasons were. And that's what the third problem requires, Your Honor, is that you focus on the reason that the prosecutor gave. Well, what was the reason the prosecutor gave on the artist was using a different name, wasn't it? That's really what it was, Judge. And then the court and the prosecutor felt that because aliases would be involved in the case, that that would put that particular juror in a different view of using aliases. And the court, I believe, agreed and said, noting that the juror might have, quote, unquote, some sort of personal interest because the case would involve witnesses who had used aliases. Yes, Your Honor. That's the reason. Okay. So, well, why is the – I'm not hearing the court come up with a different reason than what the prosecutor. Not on the artist. That is correct.  Okay. And that was – what did the prosecutor say and what did the court say? With regard to Ms. Lodahl, the prosecutor said, and I'm directing the court's attention to – we discussed this in the blue brief at page 15, and it's in the The question in step three is not whether the prosecutor – it is whether the prosecutor had given general – gender neutral reasons. It goes to the intent of the prosecutor to discriminate. And as we said in the blue brief, the court stated something totally different. They said with respect to juror number six, Ms. Lodahl, she works at the Independent Record that has published two stories on this. In her responses, she has eaten at this place. Counsel indicated that she is in a severe – is in a – serves in a functionary capacity at the place of her employment, which is what Mr. Yurkanin said below. And I don't think that there's anything gender-related in the excuse of Ms. Lodahl. So the court went beyond what the prosecutor said in his analysis. He performed his own analysis and gave reasons that were not focused on by the Ms. Lodahl for the reasons they struck Ms. Lodahl. The prosecutor didn't say she'd eaten there? The prosecutor didn't say that she'd eaten there. The court said that she said that she'd eaten there. And, in fact, she did say that she'd eaten there. But it's in the jury questionnaire. Right. Well, during the voir dire, she – there was a question generally to the panel, has anybody eaten at the restaurant? Oh, I see. And some of the folks raised their hands, and they indicated that they did. Ms. Lodahl was one of those. The court noted that as a reason. The government did not note that as a reason. And what did the government note as a reason? They noted that she was in a functionary capacity in her place of employment. Your Honors, what we ask is, because of this lack of focus that the court had below, it would have been incumbent upon them to perform a comparative analysis, as suggested by Lewis and as suggested by Alanis. Alanis indicated that a comparative analysis would have demonstrated the pretextual nature of the government's strikes. And because they were pretextual in this case, and because there was no comparative analysis, this Court cannot adequately weigh whether or not the government's discrimination purpose was shown. Therefore, prong three was not really conducted by the district court below, and this Court must reverse for that reason alone. With regard to the jury instruction issue, we believe that, as we've cited in our reply brief, United States v. Parmelee, which is a Seventh Circuit case, certainly assists this Court in determining whether or not knowingly should have been added to the jury instruction. As the Court recalls from our argument, as well as from the excerpts of record in this case, we urged the district court to add knowingly to the elements for the offense, either in the third or the fourth element. The Court refused to do that, indicating that it would add a knowingly, a general knowingly instruction. Now, what's unique about this case is that we know that the jury was confused. And we know that because they sent out a note indicating to the Court that the verdict form did not include knowingly. Now, the United States, in its response brief, in the red brief, indicates, well, that's the verdict form, and the Court instructed them that the verdict form means nothing. Look at my instructions. Well, if you look at the Court's instructions, knowingly isn't there. That was the focus of the jury question. Certainly, we believe that the Parmelee Court in 1994 had the best result that should have happened at the trial level, and that is that the defendant's guilty knowledge should have been reflected in either element three or element four. I thought that the judge instructed the jury that it had to find, in order to convict, that the defendant concealed the illegal alien for the purpose of avoiding the illegal alien's detection by the immigration authorities. For the purpose. That is correct, Your Honor. And so why isn't that the exact instruction that the statute requires on state-of-mind? Well, let me answer the question this way. It is not the exact one that the statute requires on state-of-mind, because the statute actually uses the word knowingly, and the Court did not. But it does track the language of the Ninth Circuit pattern jury instructions. Now, certainly the district court, relying on the Ninth Circuit pattern jury instructions, used the Ninth Circuit pattern jury instructions. Our request to the Court was that the defendant has to act knowingly. Knowing what? Knowing that they have assisted the person, concealed the person, shielded the person, or harbored the person. How could you have a purpose of avoiding the person's detection by immigration authorities without knowing that? Your Honors, the purpose is, it just kind of hangs out there without knowingly or without reckless disregard for the truth. And what the Parmelee Court says is exactly that, that the purpose is just hanging out there. It's not tied into the mens rea of the defendant. And it has to be tied into an unknowing act, or it has to be tied into a reckless disregard for that purpose. So he has to knowingly act with that purpose or have a reckless disregard for that purpose. That's why. I'm having trouble putting that together. If I have a purpose to do something, I can't have the purpose without knowing the things that are a predicate for that purpose. Well. I'm trying to think logically how it could just be hanging out there. I think the Court has answered its own question, and that is that the purpose has to be tied into knowingly acting. I can act with a certain purpose, but I may not act knowingly. I may act out of mistake. I may act out of accident. I may act out of. I didn't say what the purpose is. It was an acting with the purpose of avoiding detection. Those were the words, correct? That is the words. But also. I don't see how that's different than intending to avoid detection, and I think they both describe men's rig. Well, the Court brings up a very interesting question here, and that is with regard to specific intent. Now, the Ninth Circuit has said that in most instances, specific intent, a specific intent instruction is not necessary. And certainly in this case, a specific intent instruction was necessary to act with the purpose. But there's no explanation of what a specific intent is. Our argument is. The purpose of avoiding detection. Right. And they have to act knowingly with that purpose. That's the argument that we make here. And that is that they did not act knowingly. At least with regard to Ms. Yim, she acted out of mistake. Well, but I think that would be if you did the act, but it wasn't with the purpose of avoiding detection, just doing the act, that would be not knowing. But if you do the act with the purpose of avoiding detection, I'm kind of, I'm listening to Judge Kleinfeld here, and I'm saying, well, how are you, you know, how is it knowing that there? Well, Your Honor, I'm on my stop sign. I've gone through my stop sign. Go ahead and answer the question. I understand that. I am answering the question. I've gone through my stop sign with the purpose of convincing you that my argument is correct. But I've done so knowingly now. I know that I'm beyond the time. I can go through that stop sign not knowing that I've gone through it, but I've gone through it with the purpose of going into the intersection. So I have to know that I'm doing it for that specific purpose. And I did, I am, and I thank you. Thank you, counsel. Good morning, Your Honors. My name is Michael Lahr. I'm an assistant United States attorney in Montana for the District of Montana in Helena, Montana. I will address, first of all, the double jeopardy question. Counsel is correct in that this argument, this issue, centers on the act of was there implied consent or not. Is there a case directly on point on this, or are we kind of dancing around it? No, I think all of the cases, in fact, are directly on point, whether it be Smith, the Smith case, the Roberts case, the Gaitan case, or the Bates case, all of which were cited in the briefing done. All would indicate that implied consent is equal to expressed consent. The second step of that is what can show implied consent. And as Judge Kleinfeld pointed out, silence is, can be recognized as indicative of implied consent. This is not, as the panelists pointed out, this is not a case as in Gaitan or Bates where the court acted precipitously, where, for instance, in the Bates case, which was cited by the and declared a mistrial in mid-response of one of the prosecution's witnesses. This case, unlike those, is a case that slowly evolved once the court and the parties became aware that there was a problem with the interpreters. There were multiple discussions. There were alternatives that were discussed. The court acted very deliberately and cautiously at each juncture, talking to counsel and finding out what they wished to do. So there was no surprise in this case. And the cases point out that if you have the opportunity to speak but remain silent, that is indicative of implied consent. I think to directly respond to some of the comments of appellant's counsel, the statements made by the court that he was going to declare a mistrial, and they're absolutely correct. When Yim made the motion for mistrial, it was on the table at that time. It was out there. In fact, there were even discussions of double jeopardy early on. As the alternatives were discussed and the case evolved, when the court was talking about a mistrial, those statements were directed at all counsel, at all parties. The court was saying, I'm going to declare a mistrial for all of you. So it was incumbent upon any of the parties who were going to object to a mistrial to object to a mistrial at that time. So there was no surprise. The other point is that I think it's absolutely correct that it was not at an irretrievable point. When the court finally came in after there had already been multiple discussions, there had been a break of some 20 minutes, the court came in, the parties all were aware that if the government cannot find a certified interpreter in this time period, the court will undoubtedly declare a mistrial. The court had declared its intention to do so. Therefore, all parties were being warned. But yet, as the panelists pointed out, it was not irretrievable. The point of no return had not been passed. That only comes when the jury is actually dismissed. Counsel had adequate opportunity to state an objection, to discuss a further alternative of severance. And, in fact, the court specifically asked before the die was cast, do either of you need or do any of you need to state anything for the record? And nothing was said. Briefly, counsel talked about manifest necessity. Manifest necessity is not an issue, at least should not be an issue in this case. That only arises when a mistrial is ordered over the objection of one of the defendants or if that defendant did not have an opportunity to respond or object. I think the record indicates that counsel did have the opportunity to object and failed to do so. Moving on to the Batson question. Well, there's four people. And there was the one that the prosecutor said something about the maturity and age of the person. And the court said, okay, I give you that because I saw the person giggling and that type of thing. Then there was the not looking the prosecutor in the eye. And the court said, yeah, I saw that. That juror wasn't looking you in the eye. And then there was the one that I'm not sure exactly what the record one was, but the one that counsel that had to do with the administrative job. That was a little less clear to me. There was the alias one. And the court said, well, yeah, he did use a different name. I could see where that would be a personal interest. But what was the significance that the juror had an administrative job? What did that exactly mean? Well, I think the questions, and to address what appellant's counsel has said here in argument, is the concern that the court was perhaps unilaterally coming up with reasons for it. What did the prosecutor say? The prosecutor said it addressed the sophistication. Her knowledge stated that she had a job at the newspaper, but she didn't work much with people. And despite the fact that she worked at the newspaper, she didn't seem to have much interest in this case. And, in fact, her jury form, the answers given, were not very sophisticated. I think it's important to look to the record to find and to see precisely what the judge actually said, because, again, I think there is. Are these all euphemisms for the prosecutor thinking she's really not smart enough to understand the case? I think that certainly what the prosecutor was thinking is that perhaps this individual is not sophisticated or smart enough to understand the complexities. See, I couldn't understand what they were talking about, the functionary and all. If what they mean is she's too dumb, but we're too polite to just say right here in open court she's too dumb, then I can understand what they're talking about. Well, in fact, the prosecutor specifically said, to close his remarks on that juror, is that I think the issues before the jury are somewhat complex, and that's the reason we chose to strike her, based on all of the various reasons. Her answers in the jury questionnaire, the type of job that she had, and what prosecution deemed was her level of sophistication. But it's important to recognize, because there have been statements made that there was issues about the restaurant, issues about the newspaper. The court certainly did recall that during voir dire that answers, that there was discussion on the record about the fact that the newspaper had written a couple of stories, that she had eaten at the restaurant. But what's important is that the court ultimately returned to the reasons specified by the prosecutor. It did not rely on those reasons to say that that was sophistication for her striking. It was simply recalling what had transpired during voir dire. Ultimately, it stated that the fact that she serves in a functionary capacity is not, is a gender-neutral reason, and was acceptable, legitimate, nondiscriminatory, nonprotectual reason. So is that that she doesn't have a very high-level job, and so she is stupid? Would that, is that, because I think the defense, well, that's a good point in terms of just because the judge can come up with a reason. If the prosecutor has, is just going after women, just because the judge can come up with a reason, if the prosecutor's subjective reason is I want to get all the women off, the judge coming up with a reason doesn't help out, does it? No, that's exactly right. I mean, I think, I think. And the point, the point that I'm trying to make is that ultimately the judge reiterated and returned back to the precise reasons given by the prosecutor. So what we're stuck with is that she wasn't very sophisticated, this is a complex case, and the judge finally comes around to, well, she has a kind of a simple job. And that was one of the reasons expressed by the prosecution. It was her job was one of the reasons that he utilized as establishing, at least in his mind, that he did not think that she was intellectually equipped to deal with the complexities of the case. In the end, the court returned to those and said that the recognition of her functionary job is gender neutral and therefore is not a pretext. One of the points that I think needs to be brought out is concerns this aspect of comparative analysis. This court has never required or prescribed a certain mechanism, a certain type of analysis to be undertaken in the third step of the Batson analysis. There's no question that the court in this case attempted to engage in a sensitive inquiry to a meaningful analysis that was on the record and came to a conclusion that the prosecution's reasons, those reasons proffered, were not pretextual. That is what is required under Batson, and this is what this court has required in various cases. The comparative analysis is simply a tool that may be utilized, but it is not required in all cases. And I think in some ways Jim equates the comparative analysis with a proper Batson examination. That is not what this court has stated nor what the Supreme Court has stated. Furthermore, unlike the cases cited by the appellant in her briefing, in all of the cases, a comparative analysis is not simply the lack of a comparative analysis that the court finds fault with, the reviewing court finds fault with. It is instead the recognition of what the record revealed through a comparative analysis. In those cases, what the court recognized, what the reviewing court recognized, was that a review of the record revealed that you had comparative characteristics between stricken jurors and unchallenged jurors, whether it be on views on the death penalty or that a stricken juror had a reluctance to view gruesome photographs just as an unchallenged juror did or that people lived in the same neighborhoods or held the same views or had the same history. In all of the cases, the court was able to look through the record and recognize that the record contained issues of similarly situated individuals, of people with objectively similar characteristics. In, I was pronouncing it Alanisa, apparently it's not the pronunciation of that case, but in this Court's most recent, or one of its most recent interpretations or evaluations of the Court's Batson review, it said that a simple review of the record would indicate that four unchallenged jurors had exactly the same objective characteristics as challenged male jurors did. That is what the Court is looking at, and that is absent here. It is not merely the fact that a comparative analysis could be done. The question here is what would the record have revealed based on Bordier, based on the questions that were asked, based on the jury forms. There is no indication that has been brought to this Court's attention by the appellate that the record would have revealed anything, and that is what this Court is looking for, evidence of pretext, evidence of discriminatory purpose. The record does not indicate that anything like that occurred. So the mere fact that a comparative analysis was not done is not fatally flawed, the Batson analysis, when, in fact, the record apparently would not have revealed any problems as far as comparative characteristics. So if the record had been that there was a man that the, that was stupid, to use blunt terms, and he had a functionary job, and he had been left on the jury, and that was part of the record, then this Court could look at the facts of this case and say, well, I don't think that was good enough is what you're saying. But it's not in this record. I would agree with that, that if there were evidence in the record that based on answers, based on information provided, if there was a basis for comparison, if you could find objective characteristics of a male juror that related to the objective and that was borne out by the record, yes, that would be at least indicia that the prosecution's motives were discriminatory. But that is not evident in this case or in the record. Do we have, just out of curiosity, I don't know that we need it, but is the jury questionnaire from the woman who's not sophisticated, is that in the record? I don't believe it is, Your Honor. I gather that what happened was the prosecutor looked at it and it looked kind of illiterate to the prosecutor, but I'm just inferring that. I believe that that's what occurred. As far as I know, the actual jury questionnaires have not been attached or are part of the record here. Finally, in looking at the jury questions, at the jury instructions issue, again, I think the panel has focused on the proper issues before it. The Nguyen case and the Brajas Montiel case are cited by both sides here. We agree that those opinions control this matter, but there is obviously disagreement as to what those cases mean. Over and over in those two cases, especially Brajas Montiel, the court said to find the appropriate criminal intent, the instructions must state that the action was taken for the purpose of violating the immigration laws. That has to be in there somewhere. Was there an intent to violate immigration laws? That is the root of all of this. They quote the Morrissette case, an evil-meaning mind must accompany an evil-doing hand. The only way we get there is by showing an intent to violate immigration laws. In this case, the jury instruction given stated precisely that. You take an action, what is that action? It is concealment and harboring of an alien who is known to be in the United States unlawfully. That in and of itself, the government would concede, is inadequate. You need that criminal intent element. How do you get that? By expressly stating that that action has to have been done for the express purpose of avoiding detection by immigration authorities. The appellant is cited to the Parmelee case in the Seventh Circuit, and this panel should know that the Parmelee case looked at virtually the identical issue as this case looked at in the Brahas-Monteal case and came to exactly the same conclusion. It was dealing with exactly the same difficulty of only following the statutory language. Was that adequate? Did it actually bring the necessary mens rea requirement into the instructions? It similarly determined that it did not. What it stated was you could have a knowingly, or if you look at footnote number five in the Parmelee case, it also gave alternative language saying you could change the language around a little bit and use willfully. What this court did in the Brahas-Monteal, again, with exactly the same statute, which concerned the transportation of illegal aliens, what it decided could be done was the criminal intent was created by the words the transportation was done in order to help the alien remain in the United States unlawfully. That was the language which gave the criminal intent, in order to help the alien remain in the country unlawfully. In our case, what gives you the criminal intent language is the concealment was done for the purpose of avoiding detection by immigration authorities. That's your mens rea. That's your evil-meaning mind accompanying the evil-doing hand. That does give you, specifically and expressly, the required criminal intent element. I'm just curious as to how you respond to your opponent's argument. He says, my purpose is to answer the question. I know that I'm speaking when the red light is on over time, so my knowledge and my purpose are two different things. How do you respond to that? I would respond to it, I think, the same way we did it in the brief, which is if you have a purpose and that purpose is expressed, you know what you are doing while you are doing it. If you are doing something for a particular purpose, you cannot be doing it for any other purpose. Therefore, the bottom line of Bras, Montiel, of Morissette, of all these cases, is we have to ensure that someone is not convicted by mistake for an innocent act, for an accidental act. That cannot have occurred in this case. There is an expressed purpose. You had to have been doing these things for one reason and one reason only, and that is to violate the immigration laws of the United States. With the language in this instruction was as good, as clear, as expressed as it could have been. It did not need to rely on relation to other terms, other definitions. The fact is the jury could only come to one conclusion, that there was criminal intent. And so I would respond to it in that way, that if you have a purpose, you cannot have another purpose. And with that, I will close and thank you for your attention this morning. Thank you, Counsel. U.S. v. Hu and Yim is submitted. Thank you.
judges: Hall, Kleinfeld, Callahan